## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMMIE HICKS, | : | Civil No.  1:23-CV-387 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Bloom) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

## I.  Introduction

On November 13, 2019, Tammie Hicks filed an application for supplemental social security income.  A hearing was held before an Administrative Law Judge ("ALJ"), who found that Hicks was not disabled from the date she filed her application, to the date of the ALJ's decision, February 25, 2022.

Hicks now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.  After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we

conclude that substantial evidence supports the ALJ's decision in this case.  Therefore, we will affirm the decision of the Commissioner denying Hicks's claim.

## II.   Statement of Facts and of the Case

On November 13, 2019, Tammie Hicks applied for supplemental social security income, alleging disability due to a host of conditions, including bacterial pneumonia, major depressive disorder, anxiety, migraines, asthma, respiratory failure, irritable bowel syndrome, osteoarthritis, fibromyalgia, Graves' disease, lower back pain, impaired memory, and chronic obstructive pulmonary disease.  (Tr. 12, 257).  She alleged an onset date of disability of October 28, 2019.  (Tr. 12).  Hicks was 45 years old at the time of her alleged onset of disability, had completed between two and three years of college, and had past relevant work as a home health aide and cook.  (Tr. 21, 33).

Hicks' medical records indicate that she was hospitalized on October 29, 2019, due to sepsis and acute hypoxic respiratory failure.  (Tr. 353).  One week later, Hicks was discharged in good condition.  (Tr. 357).

2

Immediately before she was discharged, Hicks received a two-step respiratory test, which produced normal results. (Tr. 353).

In November of 2019, Hicks attended several follow-up appointments at Geisinger Health. (Tr. 643-46, 662). Her treatment records indicate that she had been diagnosed with, among other things, abdominal pain, respiratory failure with hypoxia, asthma, chronic low back pain, left-sided sciatica, degenerative joint disease involving multiple joints, gastric ulcers with perforation, Graves' disease, irritable bowel syndrome, and migraines. (Tr. 643-46). However, upon physical examination, Hicks exhibited a normal gait and had full strength and range of motion in her musculoskeletal system. (Tr. 662).

In December of 2019, Hicks treated with Dr. Natalie M. Klempel, Ph.D., for a neuropsychological evaluation. (Tr. 847). During the examination, Hicks displayed normal insight, judgment, affect, and mood, exhibited logical and goal-oriented thought processes, and denied hallucinations or delusions. (*Id.*). Memory and attention testing revealed that while Hicks had poor executive function, attention, and processing speed, her memory was within normal limits. (Tr. 849).

3

In January and February of 2020, Hicks attended several more follow-up appointments at Geisinger Health and Mount Nittany and reported to urgent care. (Tr. 1254, 1560, 1572, 1577-78, 2327). Hicks' Geisinger Health records indicate that she was healthy and was not in distress. (Tr. 2327). A pulmonary polysomnography taken in January of 2020 showed no obstructive lung disfunction, and a second polysomnography taken in February of 2020 showed severe hypoxia, but not sleep apnea. (Tr. 1560, 1572, 1577-78). Hicks' urgent care records note that she appeared healthy, well-nourished, and well-developed, was not in acute distress, displayed a normal gait, exhibited full strength in her musculoskeletal system, and had intact sensation. (Tr. 1254).

Between March and October of 2020, Hicks visited Mount Nittany Medical Center regarding pneumonia and Geisinger Health regarding swelling in her legs. (Tr. 1589-91, 1681-84, 1696). At Mount Nittany, Hicks received a CT scan of her chest, which was compared to a prior CT scan taken on October 29, 2019. (Tr. 1589). The scan showed no pneumothorax or pleural effusions and improvement in the scattered multifocal ground-glass airspace opacities. (*Id.*). Hicks' Mount Nittany

4

records also show that she received EEGs in March and July of 2020, which returned largely normal findings.  (Tr. 1475-76, 1665-66).  Hicks' Geisinger records show that she exhibited a normal gait in May and June of 2020, had normal neurological findings in June of 2020, and appeared healthy and non-distressed in October of 2020.  (Tr. 1683, 1994, 1696).

On December 12, 2020, Dr. Amanda White, Psy.D., an independent consultant, conducted a mental status examination on Hicks.  (Tr. 2026-2031).  During the examination, Hicks was able to count, perform simple calculations and serial threes, but could not perform serial 7s without paper.  (Tr. 2029).  During a memory test, Hicks recalled three objects immediately and two after a delay and was able to count four digits forward and four digits backward.  (*Id.*).  Dr. White noted that Hicks appeared to be functioning in the borderline to below average range of intelligence and that Hicks' fund of information was somewhat limited, as she believed there were 56 weeks in a year.  (*Id.*).

Based on her examination findings, Dr. White opined that Hicks was mildly impaired in her ability to understand, remember, and carry out simple instructions, moderately impaired in her ability to

understand, remember, and carry out complex instructions and make judgments on simple work-related decisions, and markedly impaired in her ability to make judgments on complex work-related decisions. (Tr. 2032). Dr. White also opined that Hicks had moderate limitations in her ability to interact appropriately with the public, supervisors, and coworkers and to respond appropriately to usual work situations and changes in a routine work setting. (Tr. 2033). However, Dr. White found that Hicks could concentrate, persist, and maintain pace. (*Id.*).

On January 6, 2021, Christine Fahr, NP, an independent consultant, conducted an internal medicine examination on Hicks. (Tr. 2047-53). Though Hicks reported that she used a cane and a wheelchair, she did not bring an assistive device to the examination, which she attended by herself. (Tr. 2047-48). During the examination, Hicks' gait was extremely abnormal, as she walked bent at the knees and waist and was unable to walk on her heels and toes due to pain. (Tr. 2051). However, Hicks did not need help getting off the exam table and was able to get out of her chair without difficulty. (*Id.*). Hicks also exhibited 4/5 strength in her extremities, negative straight leg testing bilaterally,

stable joints, and no muscle atrophy. (Tr. 2052). Her hand and finger dexterity and fine motor skills were intact, as she was able to zip, button, and tie objects. (*Id.*). Hicks' lungs were clear to auscultation, she had a normal AP diameter, and she exhibited normal percussion in her chest. (*Id.*). Regarding her activities of daily living, Hicks reported that she cooked three to five times per week, performed light housework, dressed and bathed herself three times per week, and cared for her two children every day, but could not do laundry because she could not walk up and down the stairs. (Tr. 2051).

Based on these findings, Fahr opined that Hicks could frequently lift and occasionally carry up to 10 pounds, occasionally lift and carry up to 20 pounds, and never lift or carry more than 20 pounds. (Tr. 2054). She also opined that Hicks could sit for two hours, stand for 30 minutes, and walk for ten minutes without interruption and could sit for eight hours, stand for four hours, and walk for two hours in total during a regular workday. (*Id.*). Fahr opined that Hicks did not need an assistive device and could occasionally climb stairs and ramps, stoop, kneel, and crouch, but could never balance, crawl, or climb ladders or scaffolds. (Tr.

7

2055, 2057, 2059). She also opined that Hicks could occasionally reach, handle, finger, feel, push, and pull with both hands. (Tr. 2055-56). Finally, Fahr opined that Hicks could only tolerate moderate noise because, among other things, Hicks suffered from migraines. (Tr. 2058).

Between April and September of 2021, Hicks attended numerous follow-up appointments at Geisinger Health. (Tr. 2664-2783). During appointments in April, June, and July of 2021, Hicks appeared normal, was alert and oriented to person, place, and time, exhibited normal behavior, affect, and mood, displayed adequate judgment, and had no focal deficits. (Tr. 2081, 2109, 2667). Similarly, in August of 2021, Hicks appeared well-developed and well-nourished, did not appear distressed, exhibited a normal breathing pattern, and had a non-distressed respiratory system. (Tr. 2702-03). However, by September of 2021, Hicks' diagnoses included generalized osteoarthritis, myalgia, myositis, and bilateral lower extremity edema. (Tr. 2706).

Against the backdrop of this evidence, the ALJ conducted a hearing regarding Hicks's disability application on January 10, 2022. (Tr. 29-60). Hicks, Hicks' husband—Tobin Hicks—and a vocational expert testified

at the hearing. (*Id.*). Following the hearing, on February 25, 2022, the ALJ issued a decision denying Hicks's application for benefits. (Tr. 12-23). First, the ALJ concluded that Hicks did not engage in substantial gainful activity between November 13, 2019, the date she applied for benefits, and February 25, 2022, the date the decision was issued. (Tr. 14). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Hicks suffered from the following severe impairments: asthma, chronic obstructive pulmonary disease, degenerative disc disease, degenerative joint disease, chronic pain syndrome, fibromyalgia, migraines, seizure disorder, generalized anxiety disorder, major depressive disorder, neurocognitive disorder, and opioid use disorder. (*Id.*). At Step 3, the ALJ concluded that none of Hicks's severe impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 14-16).

Between Steps 3 and 4, the ALJ concluded that Hicks had the residual functional capacity to:

> [P]erform light work, as defined in 20 CFR 404.1567(b) and 416.967(b) except she can stand and/or walk for up to four (4) hours in an eight (8) hour workday, can engage in occasional postural movements, but never climbing of ladders, ropes, or

9

scaffolds, must avoid concentrated exposure to temperature extremes, humidity, and noise, and avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation, must avoid all exposure to dangerous machinery and unprotected heights, and retains the capacity to perform work that is limited to simple, routine tasks, involving only simple, work-related decisions, and with few, if any, work place changes, and only occasional interaction with supervisors, co-workers, and the public.

(Tr. 16-17).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, Hicks's reported symptoms, and the medical opinion evidence. (Tr. 29-35). Ultimately, the ALJ found that Hicks' statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the objective medical evidence. (Tr. 17). Hicks testified that she stopped working as a home health aide in October of 2019, after she was hospitalized due to a lung infection and placed on a ventilator. (Tr. 34-35). Hicks also testified that she has fibromyalgia, osteoarthritis in her lower back, Graves disease, chronic memory issues, and recent seizures, all of which require her to take a wide range of medications. (Tr. 36-38, 41, 43). According to Hicks, her husband, whom she is separated from,

"lock[s] up" her medications because, when he does not, she forgets that she has already taken them and mistakenly takes multiple doses. (Tr. 38). Hicks also testified that her husband comes to her house every day to perform various chores. (Tr. 39). Specifically, she testified that he picks their children up from school, shops, picks up medicine, removes ice from the driveway, refills the pellet-burning stove, makes dinner, and does laundry because Hicks cannot walk upstairs. (Tr. 38-39).

Hicks testified that she cannot walk quickly, at an incline, or up stairs due to her COPD and that Chelsi Kremser, a physician assistant, prescribed her a walker. (Tr. 43-44). She also testified that she falls often and must switch positions approximately every ten minutes due to discomfort. (Tr. 39, 45). However, Hicks testified that she performs simple household chores, such as washing the dishes and making dinner in her air fryer. (Tr. 45-46).

Hicks' husband, Tobin Hicks, testified that he visits Hicks' house to perform chores at least twice per day and that he shops for groceries and refills the pellet-burning stove. (Tr. 49-51). He testified that since Hicks began having seizures, she has been unable to pick up their children from

school and has been less able to complete household chores.  (Tr. 51-52).

Mr. Hicks testified that on one occasion, he had to call the police after

Hicks had a seizure and almost fell down their basement stairwell.  (Tr.

51).  He also recounted an occasion where Hicks fell and grabbed the

stove, causing it to land on top of her.  (*Id.*).  Finally, Mr. Hicks testified

that he leaves notes reminding Hicks to take her pills.  (*Id.*).

The ALJ found Hicks' testimony to be inconsistent with the

objective clinical findings.  (Tr. 26).  He reasoned that although Hicks

was hospitalized due to hypoxia in October of 2019, she was discharged

in good condition one week later and subsequent pulmonary function and

CT scans returned largely normal results.  (Tr. 18).  He also noted that

Hicks had normal respiratory findings during her January 2021

consultative examination with N.P. Fahr and her follow-up appointments

in August of 2021.  (*Id.*).  Finally, the ALJ noted that Dr. Kadri Muqueet,

M.D., opined that Hicks' prognosis was good and that her respiratory

symptoms were improving.  (*Id.*).

The ALJ next considered Hicks' chronic pain syndrome,

degenerative disc and joint disease, and fibromyalgia.  (Tr. 18).  He noted

12

that, during a physical examination in June of 2020, Hicks exhibited a normal gait and no focal, motor, or sensory difficulties. (*Id.*). The ALJ reasoned that although Hicks displayed an antalgic gait, was unable to walk on her heels or toes due to pain, and was only able to squat with a 25% range of motion during her January 2021 consultative examination, she did not bring an assistive device to the exam, was able to get on and off the examination table and rise from her chair without difficulty, had stable joints, and had negative straight leg raise tests. (*Id.*).

With respect to Hicks' migraines and seizures, the ALJ reasoned that her September 2019 brain MRI revealed no evidence of a demyelinating disorder and that EEGs performed in March and July of 2020 returned normal results. (Tr. 18). He also noted that Hicks had normal neurological findings during examinations in January, April, June, July, and August of 2021 and was repeatedly found to be alert and oriented to person, place, and time. (*Id.*).

The ALJ also reasoned that although Hicks has generalized anxiety disorder, major depressive disorder, a neurocognitive disorder, and opioid use disorder, her medial records revealed a host of normal cognitive and

behavioral findings. (Tr. 19). Specifically, the ALJ noted that during examinations in December of 2019 and December of 2020, Hicks was cooperative and alert and exhibited logical, goal-directed thought processes. (*Id.*). He also reasoned that although Hicks had impaired concentration during her December 2020 consultative examination, she also had a fair manner of relating, used expressive language, and displayed fair insight and judgment. (*Id.*). Similarly, the ALJ noted that Hicks exhibited normal mood, behavior, thought content, and judgment during a treatment visit in July of 2021. (*Id.*).

Next, the ALJ considered the opinions of two state agency consultants—Dr. Stephanie Prosperi, M.D., and Dr. Anne Heather Prosperi, D.O. (Tr. 19). Dr. Anne Prosperi opined that Hicks could frequently balance, stoop, kneel, and crouch, occasionally crawl, and never climb ladders, ropes, or scaffolds. (Tr. 98). Dr. Stephanie Prosperi opined that Hicks could balance without limitation, frequently stoop, kneel, and crouch, occasionally crawl, and climb ramps and stairs, and never climb ladders, ropes, or scaffolds. (Tr. 73). Both experts opined that Hicks had no manipulative, visual, or communicative limitations,

14

but, among other things, could not tolerate concentrated exposure to noise due to her migraines.  (Tr. 73, 98-99).

The ALJ found that both opinions persuasive.  (Tr. 19-20).  He reasoned that both opinions were supported by the objective medical record, which showed that Hicks had negative straight leg raise tests, a normal gait, and stable joints with no joint deformity.  (Tr. 19).  He also found that both opinions were consistent with Hicks' activities of daily living, which included caring for herself independently and performing some household chores.  (Tr. 19-20).

The ALJ next considered the opinions of two state agency consultants—Dr. Valerie Rings, Psy. D., and Dr. Shelley Harriet, Ph.D. (Tr. 20).  Both experts opined that Hicks was not significantly limited in her ability to sustain an ordinary work routine without special supervision, work in coordination with or in proximity to others without becoming distracted and make simple work-related decisions.  (Tr. 77, 104).  Both experts also opined that Hicks was moderately limited in her ability to maintain attention for extended periods, carry out detailed instructions, complete a normal workday and workweek without

interruptions from psychological symptoms, and work at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). While Dr. Rings opined that Hicks was not significantly limited in her ability to be perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, Dr. Ross opined that Hicks was moderately limited in those areas. (*Id.*).

The ALJ found the opinions of Drs. Ross and Rings persuasive, reasoning that they were consistent with the objective medical record and Hicks' statements. (Tr. 20). He found that both opinions were consistent with notations in the medical record that Hicks exhibited fair judgment and insight, coherent thought processes, and normal speech. (*Id.*). He also noted that both opinions were consistent with Hicks' statements that she could shop online and in stores, interact with others, and maintain employment. (*Id.*).

The ALJ next considered N.P. Fahr's opinion, which he found mostly persuasive. (Tr. 20). The ALJ found that N.P. Fahr's opinion was supported by her examination findings, which revealed that Hicks had an abnormal gait and reduced strength but was able to perform straight

16

leg raise tests and had no joint deformity. (*Id.*). He also found that N.P. Fahr's opinion was supported by Hicks' statements that she performs many of her personal care activities independently, cooks and cleans, and shops in stores. (*Id.*).

The ALJ also considered Dr. White's opinion, which he also found mostly persuasive. (Tr. 20-21). The ALJ disagreed with Dr. White's conclusion that Hicks was markedly impaired in her ability to make judgments on complex work-related decisions. (Tr. 20). However, he found that the remainder of Dr. White's conclusions were consistent with the medical record—which showed that Hicks had a cooperative demeanor and clear thought processes—and with Hicks' statements that she cooks, cleans, and shops in stores. (Tr. 20-21).

Next, the ALJ considered the opinions of Dr. Kadri Muqueet, M.D., Hicks' treating pulmonologist, which he found to be mostly persuasive. (Tr. 21). Dr. Muqueet rendered two opinions—one on November 23, 2021, and another on January 11, 2022. (Tr. 2784-88, 2926-30). In his first opinion, Dr. Muqueet opined that Hicks could walk one and a half to two blocks without rest or severe pain and could sit for more than two hours

17

at a time.  (Tr. 2785).  In his second opinion, Dr. Muqueet opined that Hicks had a good prognosis, that her impairments were not expected to last for more than 12 months, that she could walk two to three city blocks without rest or pain, that she would not need unscheduled breaks during the workday, that she would likely be "off task" at work five percent of the time, and that she could tolerate moderate stress at work.  (Tr. 2927-29).  The ALJ reasoned that Dr. Muqueet's opinion was supported by the medical record, which showed that Hicks consistently had normal pulmonary and respiratory functioning and that her CT scans were benign, and by Hicks' activities of daily living, which included cooking, cleaning, and shopping in stores.  (Tr. 21).

Finally, the ALJ considered the opinion of Chelsi Lynn Kremser, PA, who personally treated Hicks.  (Tr. 21).  Though PA Kremser agreed with Dr. Stephanie Prosperi's objective findings, she opined that Hicks had significant manipulative limitations, required an assistive device to walk, and could likely walk no more than one city block without pain or rest.  (Tr. 2932-33).  PA Kremser stated that during a normal workday, Hicks would need to alternate between sitting and standing at will and

take unscheduled breaks for unpredictable lengths of time due to muscle weakness, chronic fatigue, pain, parenthesis, and numbness. (Tr. 2932). She also opined that Hicks would likely be off task 25% or more of the time at work, would need more than one day off per week, and was only capable of low stress jobs. (Tr. 2934-35).

The ALJ found PA Kremser's opinion unpersuasive on the grounds that it was inconsistent with the objective medical record and Hicks' activities of daily living. (Tr. 21). He reasoned that the record did not support PA Kremser's limitations, as it showed that Hicks had a normal gait and stable joints and was able to complete straight leg raise tests. (*Id.*). He also reasoned that PA Kremser's opinion was not supported by Hicks' activities of daily living, as she could perform personal care activities, cook, and clean. (*Id.*). He further reasoned that her opinion was not supported by the fact that she agreed with the objective findings of Dr. Stephanie Prosperi, who opined that Hicks could balance without limitation, frequently stoop, kneel, and crouch, and had no manipulative limitations. (Tr. 21, 73). Finally, the ALJ noted that PA Kremser's conclusions were inconsistent with her own examinations, which showed

that Hicks was alert, healthy, and in no distress, had minimal or no inflammation in her extremities, no joint deformities, no effusion, and less than a two second capillary refill. (*Id.*) (citing Tr. 1994, 2327).

Having made these findings, the ALJ found at Step 4 that Hicks could not perform her past work but found at Step 5 that she could perform other jobs in the national economy, such as office helper, silver wrapper, and order caller. (Tr. 21-22). Accordingly, the ALJ found that Hicks had not met the stringent standard prescribed for disability benefits and denied her claim. (Tr. 22-23).

This appeal followed. On appeal, Hicks challenges the ALJ's decision on the grounds that he incorrectly evaluated PA Kremser's opinion and failed to incorporate limitations regarding Hicks' migraines into the RFC. (Doc. 14 at 5-6). As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision should be affirmed.

III.  **Discussion**

    A.  **Substantial Evidence Review – the Role of This Court**

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted).  However, where there has been an adequately developed

factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014

WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot reweigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must

discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits

24

under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments,

including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).  Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence.  *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents her from engaging in any past relevant work.  *Mason*, 994 F.2d at 1064.  If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination.  While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other

26

courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006).   Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision.   Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence.  *Biller*, 962 F. Supp. 2d at 778–79.  These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination.  On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence

to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence.   *See Titterington,* 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application on November 13, 2019, after Social Security Regulations regarding the consideration of medical opinion evidence were amended.  Before March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard.   However, in March of 2017, the regulations governing the treatment of medical opinions were amended.  Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion.  20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066. Further, the ALJ can credit parts of an opinion

29

without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

### D. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only [ ] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154. Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Hicks first argues that the ALJ erred by finding PA Kremser's opinion unpersuasive. (Doc. 14 at 5-12). Specifically, she argues that the ALJ should have adopted PA Kremser's findings that Hicks: 1) needed to alternate between sitting and standing at will, 2) required an assistive device, 3) had significant manipulative limitations, 4) would be off task more than 25% of a normal workday, and 5) and would be absent from

work more than four days per month.  (*Id.* at 8-9).  We disagree.  In this case, the ALJ was faced with eight medical opinions.  (Tr. 19-21).  Of those eight opinions, PA Kremser's was, by far, the most restrictive and each of the five findings at issue either directly contradicts or is fundamentally inconsistent with the other seven opinions in the record. (*Id.*).

While PA Kremser opined that Hicks needed to alternate between sitting and standing at will and required an assistive device, N.P. Fahr opined that Hicks did not need an assistive device and Drs. Muqueet and Anne and Stephanie Prosperi opined that Hicks could perform tasks requiring mobility, such as balancing, stooping, kneeling, crouching, crawling, and walking two to three city blocks.  (Tr. 98-99, 2055, 2927, 2932-33).   Similarly,  though  PA  Kremser  opined  that  Hicks  had significant manipulative limitations, Drs. Anne and Stephanie Prosperi reached the opposite conclusion and N.P. Fahr opined that Hicks could occasionally reach, handle, finger, feel, push, and pull with both hands. (Tr. 73, 98-99, 2055-56, 2933).  Finally, whereas PA Kremser opined that Hicks would be off task more than 25% of a normal workday and would

be absent from work more than four days per month, Dr. Muqueet opined that Hicks would be off task five percent of the time and would not need unscheduled breaks, Dr. White opined that Hicks was not impaired in her ability to concentrate, persist, or maintain pace, and Drs. Rings and Ross opined that Hicks was not significantly limited in her ability to sustain an ordinary work routine without special supervision, moderately limited in her ability to maintain attention for extended periods, and, at most, moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (Tr. 77, 104, 2033, 2928-29, 2934-35).

The ALJ was "not only entitled but required to choose between" PA Kremser's opinion and the seven opinions that contradicted it.  *Cotter*, 642 F.2d at 705; *see also Mason*, 994 F.2d at 1066 (explaining that an ALJ may choose to credit certain opinions over others).  At this stage, we cannot reweigh the opinion evidence, *Chandler*, 667 F.3d at 359, and must defer to the ALJ's assessment if he adequately articulated the reasoning behind it.  *Durden*, 191 F. Supp. 3d at 455.   Because, as

detailed above, the ALJ thoroughly explained why he credited the seven

opinions that contradicted PA Kremser's, he adequately explained why

he found PA Kremser's opinion unpersuasive.

Hicks also argues that, when assessing PA Kremser's opinion, the

ALJ did not adequately analyze the factors of consistency and

supportability. (Doc. 14 at 9). However, the ALJ adequately considered

the consistency factor because he explained that PA Kremser's opinion

was inconsistent with the medical record—which showed that Hicks had

a normal gait and stable joints and was able to complete straight leg raise

tests—and with Hicks' activities of daily living, which included

performing personal care activities, cooking, and cleaning. (Tr. 21).

Hicks argues that the ALJ erred by reasoning that PA Kremser did not

support her opinion by agreeing with Dr. Stephanie Prosperi's objective

findings. (Doc. 14 at 10-11). However, we do not believe this reasoning

was erroneous, because, as outlined above, Dr. Prosperi's subjective

conclusions largely contradicted PA Kremser's. (Tr. 73, 2932-35).

The ALJ also considered the factor of supportability by noting that

PA Kremser's physical examinations did not support her conclusions.

(Tr. 21).  Though the ALJ's supportability analysis was short, he provided citations to two physical examinations conducted by PA Kremser, which permitted this court to review his reasoning.  (*Id.*).  As noted above, those examinations show that Hicks was alert, healthy, and in no distress, had minimal or no inflammation in her extremities, no joint deformities, no effusion, and less than a two second capillary refill.  (Tr. 1994, 2327).  Therefore, we do not believe that the ALJ erred when considering PA Kremser's opinion.

Hicks also argues that the ALJ erred by failing to include a restriction related to her migraines in the RFC.  (Doc. 14 at 12-15).  However, it appears the ALJ did include such a restriction—that Hicks must avoid concentrated exposure to noise.  (Tr. 16-17).  Though the ALJ did not explain why he included that restriction, he credited the opinions of N.P. Fahr and Drs. Stephanie and Anne Prosperi, all three of whom opined that Hicks could not tolerate exposure to loud noises due to her migraines.  (Tr. 19-20, 73, 99, 2058).  Accordingly, we believe the ALJ adequately accounted for Hicks' migraines when fashioning the RFC.

Even if the ALJ had not included restrictions related to Hicks'
migraines, his failure to do so would be, at most, harmless error. Social
Security appeals are subject to harmless error analysis. *See Holloman v.
Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Under the
harmless error analysis, a remand is warranted only if the error
"prejudices a party's 'substantial rights;'" that is, if the error "likely
affects the outcome of the proceeding, . . ." *Hyer v. Colvin*, 72 F. Supp. 3d
479, 494 (D. Del. 2014). It is well-settled that "the burden of showing
that an error is harmful normally falls upon the party attacking the
agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Here, Hicks does not explain which additional restrictions should
have been included in the RFC. (Doc. 14 at 12-15). Without knowing
which restrictions are allegedly missing, we cannot say that additional
restrictions would have changed the outcome of the proceeding.
Therefore, Hicks has not met her burden of showing that the ALJ's
alleged error was harmful.

Accordingly, under the deferential standard of review that applies
to appeals of Social Security disability determinations, we conclude that

substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 4th day of March 2024.

*<u>s/ Daryl F. Bloom</u>*
Daryl F. Bloom
United States Magistrate Judge
